BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
ELAINE A. RYAN (*To be Admitted Pro Hac Vice*)
PATRICIA N. SYVERSON (CA SBN 203111)
LINDSEY M. GOMEZ-GRAY (*To be Admitted Pro Hac Vice*)
2325 E. Camelback Rd. Suite 300
Phoenix, AZ 85016
eryan@bffb.com
psyverson@bffb.com
lgomez-gray@bffb.com
Telephone: (602) 274-1100

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
Manfred P. Muecke (CA SBN 222893)
600 W. Broadway, Suite 900
San Diego, California 92101
mmuecke@bffb.com
Telephone: (619) 756-7748

STEWART M. WELTMAN, LLC
Stewart M. Weltman (*To be Admitted Pro Hac Vice*)
53 W. Jackson Suite 364
Chicago, IL 60604
sweltman@weltmanlawfirm.com
Telephone: (312) 588-5033
(Of Counsel Levin Fishbein Sedran & Berman)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN ENGEL, an Individual, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NOVEX BIOTECH, LLC, a Utah Limited Liability company; SIERRA RESEARCH GROUP, LLC, a Utah Limited Liability company; GNC CORPORATION, a Delaware corporation,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. VIOLATION OF THE UNFAIR COMPETITION LAW, Business and Professions Code §17200 *et seq.*; and<br>2. VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT, Civil Code §1750 *et seq.*<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Julian Engel brings this action on behalf of himself and all others similarly situated against Defendants Novex Biotech, LLC, Sierra Research Group, LLC and GNC Corporation and states:

**NATURE OF ACTION**

1. Defendants manufacture, market, sell and distribute Growth Factor-9, an over-the-counter amino acid supplement. Through an extensive, widespread, comprehensive and uniform nationwide marketing campaign, Defendants promise that Growth Factor-9 is "clinically tested" to boost human growth hormone ("HGH") by a mean of 682% for those who take it. On the front of each and every Growth Factor-9 box, where consumers cannot miss it, Defendants represent that the Product is a "CLINICALLY TESTED HORMONE SECRETAGOGUE" that will provide a "682% MEAN INCREASE IN SERUM GROWTH HORMONE LEVELS" (collectively, the "growth hormone representations" or "HGH representations"). Defendants' growth hormone representations are false, misleading, and reasonably likely to deceive the public. The clinically tested representation is false because the study Defendants cite to is clearly flawed and does not and cannot serve as the basis for the representations made by Defendants.

2. Defendants have employed numerous methods to convey their uniform, deceptive growth hormone representations to consumers, including the front of the Product's packaging and labeling where it cannot be missed by consumers.

3. As a result of Defendants' deceptive growth hormone representations, consumers – including Plaintiff and members of the proposed Class – have been deceived into purchasing what they believed to be a Product that was shown in clinical testing to increase human growth hormone by a mean of 682%, when the sole study on which the HGH benefit claim is based is not credible scientific support for the "682% MEAN INCREASE IN SERUM GROWTH HORMONE

LEVELS" representation. Further, there is absolutely no support from any credible scientific source that any of the ingredients in Growth Factor-9, alone or in combination, in the dosages found in the Product, provide the represented growth hormone level.

4. Plaintiff brings this action on behalf of himself and other similarly situated consumers who have purchased Growth Factor-9 to halt the dissemination of this false, misleading and deceptive advertising message, correct the false and misleading perception it has created in the minds of consumers, and obtain redress for those who have purchased Growth Factor-9. Based on violations of state unfair competition laws (detailed below), Plaintiff seeks injunctive and restitutionary relief for consumers who purchased the Product.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over Defendants and the claims set forth below pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds $5,000,000 and is a class action with greater than 100 class members, many of whom are citizens of a state different than Defendants.

6. This Court has personal jurisdiction over Defendants because Defendants are authorized to conduct and do business in California, including this District. Defendants have marketed, promoted, distributed, and sold Growth Factor-9 in California and Defendants have sufficient minimum contacts with this State and/or sufficiently avail themselves of the markets in this State through their promotion, sales, distribution and marketing within this State, including this District, to render the exercise of jurisdiction by this Court permissible.

7. Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred while he resided in this judicial district. Venue is also proper under 18

U.S.C. §1965(a) because Defendants transact substantial business in this District.

**PARTIES**

8. Plaintiff Julian Engel is a citizen of California and resides in Petaluma, California. In or around October 13, 2013, Plaintiff purchased one box of Growth Factor-9 from a GNC in Petaluma, California. Prior to purchasing the Product, Plaintiff Engel was exposed to and saw advertisements for the Product in at least one magazine and on websites such as GNC.com promoting the Product. After reading the advertisements, Plaintiff Engel went to GNC to purchase the Product. While at GNC, Plaintiff Engel read the Product label, in addition to the in-store GNC advertisements, which reaffirmed the claims he saw in the magazine and on-line advertisements – that the Product is "CLINICALLY TESTED" to provide a "682% MEAN INCREASE IN SERUM GROWTH HORMONE LEVELS". Relying on these claims, Plaintiff Engel purchased and used the Product as directed. Believing that if he continued using the Product it would work, Plaintiff purchased two more boxes of Growth Factor-9 on or around November 13, 2013 and December 13, 2013. He paid approximately $99.00 for the first two boxes and $79.99 for the last box. The sole study on which the "682% MEAN INCREASE IN SERUM GROWTH HORMONE LEVELS" representation is based does not constitute credible scientific support for the claim. In fact, there is absolutely no support from any credible scientific source that any of the ingredients in Growth Factor-9, alone or in combination, in the dosages in the Product, provide the represented growth hormone level. As a result, Plaintiff suffered injury in fact and lost money. Had Plaintiff known the truth about Defendants' misrepresentations and omissions, he would not have purchased Growth Factor-9.

9. Defendant Novex Biotech, LLC is an entity organized and existing under the laws of Utah with its principal place of business at 5742 West Harold Gatty Drive, Salt Lake City, Utah, 84116. Novex Biotech distributes, markets and

sells Growth Factor-9 to consumers nationwide and created the deceptive growth hormone representations, which it caused to be disseminated to consumers nationwide, including in California.

10. Defendant Sierra Research Group, LLC is a Utah limited liability company with its principal place of business at 5742 West Harold Gatty Drive, Salt Lake City, Utah 84116. Sierra Research Group developed the proprietary amino acid compound; licensed it to Novex Biotech to manufacture, market and sell under the brand name Growth Factor-9; and created the deceptive growth hormone representations, which it caused to be disseminated to consumers nationwide, including in California.

11. Defendant GNC Corporation is a Delaware corporation headquartered in Pittsburg, Pennsylvania. GNC operates more than 4,800 retail locations throughout the United States, including in California, and specializes in the sale of and advice to consumers about nutritional supplements. GNC promoted, marketed and sold Growth Factor-9 to consumers nationwide, including in California. Growth Factor-9 is sold exclusively at GNC.

12. Plaintiff is informed and believes, and thus alleges, that at all times herein mentioned, each of the Defendants was the agent, employee, representative, partner, joint venturer, and/or alter ego of the other Defendant and, in doing the things alleged herein, was acting within the course and scope of such agency, employment, representation, on behalf of such partnership or joint venture, and/or as such alter ego, with the authority, permission, consent, and/or ratification of the other Defendants.

## FACTUAL ALLEGATIONS

***Growth Factor-9***

13. Growth Factor-9 is sold online and at GNC retail locations. It is marketed as a product that purportedly raises the body's natural levels of human

growth hormone, unlike synthetic HGH injections. A 120 count bottle of Growth Factor-9 retails for approximately $99.00.

14. Since the Product's launch, Defendants have consistently conveyed the message to consumers throughout the United States, including California, that Growth Factor-9 is "CLINICALLY TESTED" to provide a "682% MEAN INCREASE IN SERUM GROWTH HORMONE LEVELS". Defendants' growth hormone representations are false, misleading and deceptive.

15. GNC aided in the overall marketing effort. For example, GNC states on its "About Us" website link that it "sets the standard in the nutritional supplement industry by demanding truth in labeling, ingredient safety and product potency, all while remaining on the cutting-edge of nutritional science…. From scientific research and new product discovery to the manufacturing and packaging processes, GNC takes pride in our rigorous approach to ensuring quality."

16. GNC's statements on its website include: "CLINICALLY TESTED" to provide a "682% MEAN INCREASE IN SERUM LEVELS" and a description of "a recent, randomized, cross-over, double-blind clinical trial" purportedly supporting the growth hormone representations.

17. In exchange for its exclusive Growth Factor-9 seller status, GNC contributes a variety of additional advertising strategies to market and promote the growth hormone representations. These strategies include marketing support in the form of placement in GNC's catalogs, in-store flyers and features on GNC's website.

18. The sole study purportedly supporting Defendants' HGH benefit representations is riddled with so many flaws that it is completely unreliable. Among other shortcomings, the test subjects' baseline growth hormone levels were much lower than the placebo group at the beginning of the test. Because the test group's HGH levels were so low, it would be expected that they would rise more

than the placebo group and any result showing this would have been due to the imbalance between the two groups rather than Growth Factor-9. There were no apparent adjustments made to correct for this imbalance. Further, and significantly, Defendants falsely represent that the study results demonstrated a 682% mean increase in serum HGH levels. Even if a 682% mean increase in serum HGH levels was accurately reported despite the multitude of study design flaws, the 682% only represents a within-group result that does not account for the statistical significance of the comparative placebo results and, thereby, necessarily attributes inflated results to Growth Factor-9.

19. The Growth Factor-9 study results were also flawed due to other confounding factors for which no controls were put into place by the researchers including, but not limited to, (1) failing to control for the amount of exercise that each subject engaged in, when exercise is known to be a potent stimulator of growth hormones, and (2) failing to control the time of day the placebo and Growth Factor-9 blood samples were taken, when it is known that growth hormone is released by the pituitary gland in bursts. If the blood samples were taken at different times of the day when the placebo and Growth Factor-9 supplement were ingested, Growth Factor-9 ingestion may well have been at those times that growth hormone was being naturally secreted by the anterior pituitary gland; and, in contrast, the placebo ingestion could have been at the time of the day when growth hormone levels were being lowered naturally. Thus, no confidence can be placed on the results without knowing the times of the day when the samples were taken, which the study tellingly omits.

20. In addition, Defendants do not rely on a study ***report*** of the type that would be accepted by any credible, peer-reviewed scientific journal. Rather, Defendants rely on a published study ***abstract*** and, even then, the "abstract" published on Defendants' web site materially enhances what is stated in the

published abstract. Moreover, published abstracts – as opposed to reports – are not peer-reviewed and are not relied on by the scientific community unless subsequently published in a full final report in a peer reviewed journal. The Growth Factor-9 study abstract also does not identify who funded the study – a strong indicator of potential bias.

21. Further, although the study abstract reports results of 16 study participants, there is no mention of the total number of participants enrolled in the study. Thus, there is no way to determine whether these 16 participants represent the whole study or whether data was improperly mined to arrive at a desired result. And, no mention is made of what statistical technique was used to analyze the data such that the results cannot be independently confirmed. Finally, and significantly, Defendants fail to accurately represent the actual study abstract on their website. Defendants falsely represent that the Growth Factor-9 study was double-blinded – one indicator of a high quality study – when the published study abstract does not indicate that it was double-blinded – a fact, that if it exists, is routinely mentioned. For all these reasons, and others, the Growth Factor-9 study upon which Defendants rely is not competent and reliable evidence of a "682% MEAN INCREASE IN SERUM GROWTH HORMONE LEVELS".

22. In addition to the affirmative growth hormone misrepresentations, Defendants omit the following material information: there is absolutely no credible scientific evidence that the ingredients in Growth Factor-9, alone or in combination, in the dosages in the Product, provide the represented 682% mean increase in serum growth hormone levels. Indeed, the FTC's stated position is that there is "no reliable evidence to support the claim that these 'wannabe' products have the same effect as prescription HGH." FTC, Anti-Aging Products, *available at* http://www.consumer.ftc.gov/articles/0118-anti-aging-products (prescription HGH is given via an injection).

23. The popularity of HGH was the result of a New England Journal of Medicine articles published in 1990s that reported positive results from injection HGH. As a result, pricey HGH clinics sprung up, charging upwards of $1500 per day for HGH injections even though the FDA has not approved HGH injections for anti-aging.

24. As for non-injectable HGH, the New England Journal of Medicine published a follow-up editorial about "imposter" HGH products in 2003, warning, "If people are induced to buy a 'human growth hormone releaser' on the basis of research published in the Journal, they are being misled."

25. The FDA has also stated that it is unaware of any reliable evidence to support anti-aging claims for over-the-counter pills and sprays that supposedly contain HGH and the Agency has not approved any such products for anti-aging or any other purpose.

26. Each and every consumer who purchases Growth Factor-9 is exposed to Defendants' deceptive growth hormone representations because they appear prominently and conspicuously on the front of each box as follows:




*See* Exhibit A for a copy of the complete label.

***The Impact of Defendants' Wrongful Conduct***

27. Even though the sole study Defendants rely upon to support their "CLINICALLY TESTED" growth hormone benefit representation does not provide credible scientific support for the "682% MEAN INCREASE IN SERUM GROWTH HORMONE LEVELS", Defendants continue to unequivocally convey through their advertising and labeling that it does. They continue to make the growth hormone representations even though there is absolutely no credible scientific evidence that the Growth Factor-9 ingredients, alone or in combination, in the dosages in the Product, provide the represented "682% MEAN INCREASE IN SERUM GROWTH HORMONE LEVELS" to anyone.

28. As the manufacturers and distributors of Growth Factor-9, Defendants possess specialized knowledge regarding the content and effects of the ingredients contained in Growth Factor-9 and are in a superior position to learn of the effects—and have learned of the effects—Growth Factor-9 has on consumers.

29. Specifically, Defendants knew or should have known, but failed to disclose, that the sole purported clinical study upon which they rely does not provide credible support for the "682% MEAN INCREASE IN SERUM GROWTH HORMONE LEVELS," and there is absolutely no credible scientific evidence that the Growth Factor-9 ingredients, alone or in combination, in the dosages in the Product, provide the represented "682% MEAN INCREASE IN SERUM GROWTH HORMONE LEVELS" to anyone.

30. Plaintiff and Class members have been and will continue to be deceived or misled by Defendants' deceptive HGH representations. Plaintiff purchased the Product during the Class period and in doing so, read and considered the Growth Factor-9 labeling and packaging and based his decision to buy the Product on the HGH representations. Defendants' HGH representations were a material factor in influencing Plaintiff's decision to purchase and consume the Product. Plaintiff would not have purchased the Product had he known that Defendants' HGH representations were false and misleading.

31. As a result, Plaintiff and the Class members have been damaged in their purchases of the Product and have been deceived into purchasing a Product that they believed, based on Defendants' representations, was clinically tested to increase HGH levels by a mean of 682%, when, in fact, there is no credible scientific support that the ingredients in Growth Factor-9, alone or in combination, in the dosages in the Product, provide the represented benefits to anyone.

32. Defendants, by contrast, have reaped enormous profits from their false marketing and sale of Growth Factor-9. Defendants charge a substantial premium

for Growth Factor-9 over other HGH supplements that do not promise a specific HGH benefit – let alone a mean HGH increase of 682%.

## CLASS DEFINITION AND ALLEGATIONS

33. Plaintiff brings this action on behalf of himself and all other similarly situated Class members pursuant to Rule 23(a), b(2) and b(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendants for violations of California state laws and/or similar laws in other states:

> **Multi-State Class Action**
> All Consumers who, within the applicable statute of limitations period, purchased Growth Factor-9 in California and states with similar laws.
>
> Excluded from this class are Defendants and their officers, directors, and employees and those who purchased Growth Factor-9 for re-sale.

34. In the alternative, Plaintiff seeks certification of the following Class:

> **California-Only Class**
> All consumers who, within the applicable statute of limitations period, purchased Growth Factor-9 in California.
>
> Excluded from this Class are Defendant and its officers, directors and employees and those who purchased Growth Factor-9 for the purpose of resale.

35. ***Numerosity***. The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiff is informed and believes that the proposed Class contains thousands of purchasers of Growth Factor-9 who have been damaged by Defendants' conduct as alleged herein. The precise number of Class members is unknown to Plaintiff. However, the proposed Class is ascertainable.

36. ***Existence and Predominance of Common Questions of Law and Fact***. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether the claims discussed above are true, or are misleading, or objectively reasonably likely to deceive;

(b) whether Defendants' alleged conduct violates public policy;

(c) whether the alleged conduct constitutes violations of the laws asserted;

(d) whether Defendants engaged in false or misleading advertising; and

(e) whether Plaintiff and Class members are entitled to other appropriate remedies, including corrective advertising and injunctive relief.

37. ***Typicality***. Plaintiff's claims are typical of the claims of the members of the Class because, *inter alia*, all Class members were injured through the uniform misconduct described above and were subject to Defendants' deceptive HGH representations that accompanied each and every box of Growth Factor-9. Plaintiff is advancing the same claims and legal theories on behalf of himself and all members of the Class.

38. ***Adequacy of Representation***. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class.

39. ***Superiority***. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small

compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

40. Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendants from engaging in the acts described, and requiring Defendants to provide full restitution to Plaintiff and Class members.

41. Unless a Class is certified, Defendants will retain monies received as a result of their conduct that were taken from Plaintiff and Class members. Unless a Class-wide injunction is issued, Defendants will continue to commit the violations alleged, and the members of the Class and the general public will continue to be deceived.

42. Defendants have acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief with respect to the Class as a whole.

**COUNT I**
**Violation of Business & Professions Code §17200, *et seq.***
**(Applicable to the Multi-State or California-only Class)**

43. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

44. Plaintiff brings this claim individually and on behalf of the Class.

45. As alleged herein, Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because he purchased Growth Factor-9 in reliance on Defendants' claim that the Product was clinically tested to increase HGH levels by a mean of 682% when, in fact, there is no credible scientific support that the ingredients in Growth Factor-9, alone or in combination, in the dosages in the Product, provide the represented benefits to anyone.

46. The Unfair Competition Law, Business & Professions Code §17200, *et seq*. ("UCL"), and similar laws in other states, prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising.

47. In the course of conducting business, Defendants committed unlawful business practices by, *inter alia*, making the HGH representations (which also constitutes advertising within the meaning of §17200) and omissions of material facts, as set forth more fully herein, and violating Civil Code §§1572, 1573, 1709, 1711, 1770(a)(5), (7), (9) and (16) and Business & Professions Code §§17200, et seq., 17500, et seq., and the common law. Plaintiff and the Class reserve the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

48. In the course of conducting business, Defendants committed "unfair" business practices by, *inter alia*, making the HGH representations (which also constitutes advertising within the meaning of §17200) and omissions of material facts regarding Growth Factor-9 in their advertising campaign, including the Product's packaging, as set forth more fully herein. There is no societal benefit from false advertising, only harm. Plaintiff and other Class members paid for HGH

benefits supported by clinical testing, which they did not receive. While Plaintiff and Class members were harmed, Defendants were unjustly enriched by their false representations and omissions. Because the utility of Defendants' conduct (zero) is outweighed by the gravity of the harm Plaintiff and Class members suffered, Defendants' conduct is "unfair" having offended an established public policy. Further, Defendants engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

49. Further, as stated in this Complaint, Plaintiff alleges violations of consumer protection, unfair competition and truth–in–advertising laws resulting in harm to consumers. Defendants' acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code §17200, et seq.

50. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

51. Business & Professions Code §17200, et seq., also prohibits any "fraudulent business act or practice."

52. In the course of conducting business, Defendants committed "fraudulent business acts or practices" by, *inter alia*, making the HGH representations (which also constitutes advertising within the meaning of §17200) and omissions of material facts regarding Growth Factor-9 in their advertising campaign, including the Product's packaging, as set forth more fully herein.

53. Defendants misrepresented on each and every Product package that the Product is clinically tested to cause a 682% mean increase in serum HGH levels when, in fact, the clinically tested representation is false and there is absolutely no credible scientific evidence that the Growth Factor-9 ingredients, alone or in combination, in the dosages found in the Product, provide the represented growth

hormone benefits.

54. Defendants' actions, claims, omissions and misleading statements, as more fully set forth above, were also false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §17200, et seq.

55. Plaintiff and other members of the Class have in fact been deceived as a result of their reliance on Defendants' material representations and omissions, which are described above. This reliance has caused harm to Plaintiff and other members of the Class who each purchased Defendants' Growth Factor-9. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of these unlawful, unfair, and fraudulent practices.

56. Defendants knew, or should have known, that their material representations and omissions would be likely to deceive the consuming public and result in consumers purchasing Growth Factor-9 and, indeed, intended to deceive consumers.

57. As a result of their deception, Defendants have been able to reap unjust revenue and profit.

58. Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate

59. Plaintiff, on behalf of himself, all others similarly situated, and the general public, seeks restitution of all money obtained from Plaintiff and the members of the Class collected as a result of unfair competition, an injunction prohibiting Defendants from continuing such practices, corrective advertising and all other relief this Court deems appropriate, consistent with Business & Professions Code §17203.

/ / /

/ / /

**COUNT II**
**Violations of the Consumers Legal Remedies Act –**
**Civil Code §1750 *et seq.***
**(Applicable to the Multi-State or California-only Class)**

60. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

61. Plaintiff brings this claim individually and on behalf of the Class.

62. This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §1750, *et seq.* (the "Act") and similar laws in other states.

63. Plaintiff is a consumer as defined by California Civil Code §1761(d). Defendants' Growth Factor-9 is a "good" within the meaning of the Act.

64. Defendants violated and continue to violate the Act by engaging in the following practices proscribed by California Civil Code §1770(a) in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of Growth Factor-9:

(5) Representing that [Growth Factor-9 has] . . . approval, characteristics, . . . uses [and] benefits . . . which [it does] not have . . . .

* * *

(7) Representing that [Growth Factor-9 is] of a particular standard, quality or grade . . . if [it is] of another.

* * *

(9) Advertising goods . . . with intent not to sell them as advertised.

* * *

(16) Representing that [Growth Factor-9 has] been supplied in accordance with a previous representation when [it has] not.

65. Defendants violated the Act by representing and failing to disclose material facts on the Growth Factor-9 labeling and packaging and associated advertising, as described above, when they knew, or should have known, that the representations were false and misleading and that the omissions were of material facts they were obligated to disclose.

66. Pursuant to California Civil Code §1782(d), Plaintiff and the Class seek a Court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

67. Pursuant to §1782 of the Act, Plaintiff notified Defendants in writing by certified mail of the particular violations of §1770 of the Act and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act. Copies of the letters are attached hereto as Exhibit B.

68. If Defendants fail to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the Act, Plaintiff will amend this Complaint to add claims for actual, punitive and statutory damages, as appropriate.

69. Defendants' conduct is fraudulent, wanton and malicious.

70. Pursuant to §1780(d) of the Act, attached hereto as Exhibit C is the affidavit showing that this action has been commenced in the proper forum.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for a judgment:

A. Certifying the Class as requested herein;

B. Awarding restitution and disgorgement of Defendants' revenues to Plaintiff and the proposed Class members;

C. Awarding injunctive relief as permitted by law or equity, including:

enjoining Defendants from continuing the unlawful practices as set forth herein;

D. Ordering Defendants to engage in a corrective advertising campaign;

E. Awarding attorneys' fees and costs; and

F. Providing such further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial of his claims by jury to the extent authorized by law.

Dated: July 30, 2014

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.

/s/*Patricia N. Syverson*
Elaine A. Ryan (*To be Admitted Pro Hac Vice*)
Patricia N. Syverson (203111)
Lindsey M. Gomez-Gray (*To be Admitted Pro Hac Vice*)
2325 E. Camelback Rd., Suite 300
Phoenix, AZ 85016
eryan@bffb.com
psyverson@bffb.com
lgomez-gray@bffb.com
Telephone: (602) 274-1100

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
Manfred P. Muecke (222893)
600 W. Broadway, Suite 900
San Diego, California 92101
mmuecke@bffb.com
Telephone: (619) 756-7748

STEWART M. WELTMAN, LLC
Stewart M. Weltman (*To be Admitted Pro Hac Vice*)
53 W. Jackson Suite 364
Chicago, IL 60604
sweltman@weltmanlawfirm.com
Telephone: (312) 588-5033
(Of Counsel Levin Fishbein Sedran & Berman)

Attorneys for Plaintiff